**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS, | )<br>)<br>) |
| Plaintiff, | ) Civil Action No. 4:21-cv-00058<br>)<br>) |
| v. | )<br>) |
| BANCTEC, INC. and EXELA TECHNOLOGIES, INC., | )<br>)<br>) |
| Defendants. | )<br>)<br>) |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND SPECIFIC**
**PERFORMANCE**

Plaintiff American Family Life Assurance Company of Columbus ("Aflac") hereby brings this Complaint against Defendants BancTec, Inc. ("BancTec") and Exela Technologies, Inc. as assignee of BancTec and administrator of that certain Master Services Agreement at issue ("Exela"), and shows the Court the Following:

**NATURE OF THE ACTION**

1.      This is an action to require Defendants' immediate performance of various termination obligations pursuant to the terms of the Master Services Agreement between Aflac and BancTec (the "Agreement"), under which Exela, who assumed BancTec's contractual obligations through an assignment in 2018, agreed to perform inbound mail processing, document processing, and cash management operations for Aflac, functions that are critical to Aflac's

business and which substantially impact Aflac's ability to make its insurance customers whole by processing their claims in a proper and timely manner (the "Services").[1]

2.      The Services were originally performed in-house by Aflac but were outsourced to BancTec pursuant to the Agreement beginning in 2008.

3.      Defendants' immediate performance of the termination obligations under the Agreement are necessary prerequisites for the turnover and return of the Services back to Aflac, in order for Aflac to begin operations of the Services as soon as possible and by no later than May 24, 2021.

4.      Aflac had the right to terminate the Agreement for cause or for convenience and, upon notice of termination, the right to require that Exela assist in transferring the Services, to Aflac or a third party, for a period of up to eighteen months.

5.      Since the spring of 2020, the quality of Exela's performance of the Services have dramatically deteriorated, in part due to Exela's increasing employee attrition, resulting in delays in Aflac's claims handling process and frustrating its customers and insureds.   After Exela repeatedly failed to meet numerous performance indicators, Aflac first tendered to Exela a notice of termination for convenience on November 5, 2020, and subsequently tendered a notice of termination for cause on March 15, 2021, and requested Exela's assistance in transitioning the subject Services, with Aflac scheduled to take over the subject services effective May 24, 2021. Despite the impending deadline, and continuing deteriorating performance, Exela has refused to perform simple, preliminary steps to transfer the Services back to Aflac.

---

[1] Because the contents of the Master Services Agreement and amendments thereto contain certain proprietary information have been deemed confidential, the agreement is not attached but if needed, will be filed either under seal pursuant to a motion and the Court's order, or alternatively, filed in a redacted format upon the parties' agreement as to the portions that must be redacted.

6.      Based thereon, Aflac seeks a declaration of Exela's breach, emergency injunctive relief and Exela's specific performance to protect Aflac's business operations, goodwill and reputation with its customers, and ensure it continues to meet its statutory duties to its insureds, by the Court ordering Exela to fulfill its contractual obligations.

## PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff American Family Life Assurance Company of Columbus is a foreign insurance company, organized under the laws of the State of Nebraska, having its principal place of business at 1932 Wynnton Rd, Columbus, Georgia. Accordingly, Aflac is a citizen of Georgia and Nebraska.

8.      BancTec is a corporation incorporated and existing under the laws of the State of Delaware, having its principal place of business at 2701 East Grauwyler Road, Irving, Texas. Therefore, BancTec is a citizen of the State of Delaware and Texas.

9.      BancTec may be served with summons and this Complaint via its registered agent for service, Corporation Service Company, located at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

10.      Exela Technologies, Inc. is a corporation incorporated and existing under the laws of the State of Delaware, also having its principal place of business at 2701 East Grauwyler Road, Irving, Texas.  Therefore, Exela is a citizen of the State of Texas.

11.      Exela may be served with summons and this Complaint via its registered agent for service, Cogency Global Inc., located at 850 New Burton Road, Suite 201, Dover, Delaware, 19904.

12.      The Services at issue are performed primarily at Defendant's Brookstone Operations Center, located at 2300 Brookstone Center, Columbus, Georgia 31906.

13.     This Court has specific personal jurisdiction over Defendants BancTec and Exela, which consented to this Court's personal jurisdiction as part of the Agreement, and which operate the business for the Services at issue within this judicial district.

14.     This Court has subject matter jurisdiction over Aflac's claims pursuant to 28 U.S.C. §§ 1332 and 1367, as there is complete diversity between the parties and the amount in controversy, the value of Exela's obligations under the Master Services Agreement, exceeds $75,000.00, exclusive of interest, fees and costs. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977) ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.").

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (b)(2) and (d) because both Defendants are deemed to reside in this juridical district where they have sufficient contacts, the subject matter of the lawsuit is an Agreement that concerns acts and performance required of Defendants at their business operation and at Aflac's business operation, both of which are located in this judicial district.  Venue is also proper in this Court because of the parties' express consent that venue would lie in this Court.

## STATEMENT OF FACTS

16.     On May 15, 2008, Aflac entered into the Agreement with BancTec, under which BancTec, and subsequently Exela, was responsible for performing the Services, including processing all incoming mail, processing all payments received by Aflac, preparing all incoming documents and files for imaging and ingestion, imaging all documents received for further processing, ingesting all documents into various workflow systems for further processing by Aflac, and reconciling all apparent payment discrepancies.

17.     Exela was formed and acquired BancTec through merger in 2016, and Exela assumed and guaranteed BancTec's obligations, including the Services and the required termination obligations at issue under the Agreement, in 2018.

18.     Given that the Services concern nearly all of Aflac's payments, incoming documents, incoming mail and communications with its customers and insureds, they are essential to Aflac's business operations, Aflac's reputation among its customers, and Aflac's ability to satisfy its various statutory obligations to its insureds located in the numerous states around the country.

19.     Since spring of 2020, Exela failed on several occasions to meet the performance levels required for the Services.

20.     Exela's performance of the Services dramatically deteriorated, in part due to Exela's increasing employee attrition.

21.     In an effort to stave off and mitigate the harm caused by Exela, in or about November 2020, Aflac decided to bring the Services back in-house, and pursuant to that decision, sent Exela a notice of termination of the Agreement for convenience on November 5, 2020, with a planned turnover date of February 2021 (the "November Termination Notice").

22.     Exela, however, suggested and Aflac agreed, that the parties would continue to operate under the Agreement while allowing Aflac to still invoke the termination rights under Section 13 of the Agreement.  Exela then delayed negotiations for months, ultimately refused to enter an agreement stating its intent to proceed under the termination rights, and refused to issue the WARN Act notice Exela stated it is required to issue to the employees who provide the Services for Aflac which prevents Aflac from making offers of employment to those employees.

23.     Because of Exela's delay and because Exela had breached Critical Performance Indicators of the Agreement, Aflac tendered the March Termination Notice on March 15, notifying Exela it was terminating the Agreement <u>for cause</u>, with Aflac scheduled to take over the subject Services effective May 24, 2021.

24.     With the March Termination Notice, Aflac also invoked the termination assistance services from Exela under the Agreement, which require Exela to take certain steps in order to transfer the Services back to Aflac.

**A.  Relevant Terms of the Agreement**

25.     The Agreement provides the following terms relevant to the termination and Exela's obligations to transfer the Services:

> 12.3 <u>Termination by Aflac for Cause</u>. Aflac may terminate this Agreement for cause immediately upon written notice to BancTec by Aflac, if:
>
> . . .
>
>   (b) BancTec fails to meet a given Critical Performance Indicator for three (3) consecutive months[.]
>
> . . .
>
> 12.5 <u>Termination by Aflac for Convenience</u>. *Aflac* may elect to terminate this Agreement after the thirteenth (13th) month of the Effective Date for its convenience, by providing *BancTec* with ninety (90) days' prior written notice stating *Aflac's* election to terminate for its convenience and the effective date of such termination[.]
>
> . . .
>
> 13.2 <u>Extension</u>. Upon any termination of this Agreement by either Party . . . Aflac may extend the Term of this Agreement for a period not to exceed one (1) year after the otherwise effective date of termination . . . The provisions of this Agreement will remain in effect during such extension. Aflac may exercise such option by providing BancTec written notice of its election to extend (i) following termination of this Agreement by Aflac for Cause at least thirty (30) days prior to the otherwise effective date of termination . . .
>
> 13.3 <u>Service Transfer Assistance</u>.

During the period after any termination of this Agreement, or expiration of this Agreement (the "Termination Assistance Period"), *BancTec* will perform termination assistance services as reasonably requested by *Aflac* in a Termination Assistance Plan submitted by *Aflac* to *BancTec* as well as the other rights and services described in this Article 13. The Parties will use reasonable efforts to limit the Termination Assistance Period to no more than eighteen (18) months after the termination or expiration of this Agreement.

13.4   <u>Other Rights</u>. At the expiration or earlier termination of this Agreement for any reason, however described, and continuing through any extension, renewal and Termination Assistance Period, *BancTec* agrees that:

. . .

(b) *BancTec* will sell to *Aflac* at *Aflac's* request all other Hardware and tangible property that are owned by *BancTec* and which on the date of expiration or termination of this Agreement *BancTec* is using on a dedicated basis to perform the Services. *Aflac* will pay *BancTec* in such event the fair market value for such property, as determined by a mutually agreed appraisal paid for by Aflac. In the case of property that *BancTec* is leasing, *BancTec* agrees to permit *Aflac* or its designee to either buy-out the lease on such property and purchase the property from the lessor or assume the lease(s) and secure the release of *BancTec* thereon. *Aflac* shall be responsible for any sales, use or similar Taxes associated with such purchase of such property or the assumption of such leases.

(c) *BancTec* will offer a license to Aflac at no additional charge (other than ongoing support charges not otherwise covered by arrangements between *BancTec* and Aflac) for all Software owned by *BancTec* used in the performance of the Services that is made commercially available by *BancTec*. *Aflac* shall not be obligated to reimburse *BancTec* for any one-time fees that may otherwise be chargeable for such Software.
. . .

(h) *Aflac* or its designee shall have the right to make offers of employment to any or all *BancTec* Service Employees who devote a substantial portion of their time and effort to the performance of the Services for the *Aflac Group* hereunder. *BancTec* agrees that promptly after either Party sends the other Party written notice of termination or expiration, *BancTec* shall supply *Aflac* at no charge with the names and resumes requested by *Aflac* for the purpose of exercising its rights under this Section 13.4; provided that no name or resume for a specific employee shall be provided to *Aflac* until after *BancTec* has

notified the employee of *Aflac*'s interest and obtained the employee's consent. *BancTec* will waive any provision of any *BancTec* Service Employee employment contract or covenant that may otherwise limit the right of any such employee to accept employment with the *Aflac Group*.

**B.  Exela's Willful Breach of the Agreement**

26.     Exela has failed to perform its contractual obligations as required in order to timely transfer the Services to Aflac, by repeatedly forestalling the implementation of crucial, yet simple, preliminary steps.

27.     Since Aflac served the November Termination Notice, the quality of Exela's services have quickly deteriorated even further, due in part to the ever-increasing attrition among Exela's employees, and Exela repeatedly missed several Critical Performance Indicators.

28.     Making matters worse, because Exela has known since November that the Agreement is due to be terminated, its representatives have admitted that it has no incentive to replace the employees it has lost, further compounding its staffing problems and the performance issues for the Services and demanded relief from Aflac in the form of service level credits that accrue due to missed service levels as a precursor to executing any agreements and issuing the aforementioned WARN Act notice.

29.     With the March Termination Notice, Aflac invoked its right to Exela's assistance in transferring the Services back in-house to Aflac, pursuant to Sections 13.2,13.3, and 13.4 of the Agreement.

30.     Because the Services are critical for Aflac's business, Aflac's representatives have endeavored in good faith to timely begin transition of the Services ahead of the turnover of operations now scheduled to begin May 24, 2021.

31.     Exela has failed, however, to perform its transition obligations under Sections 13.2, 13.3 and 13.4 of the Agreement by:

a)   refusing to effectuate the sale to Aflac of the necessary Hardware as required under 13.4(b);

b)   refusing to offer a license with support and maintenance to Aflac at no additional charge for the Exela software used in the performance of the Services as required under 13.4(c); and

c)   refusing to supply Aflac with the names and resumes of all Exela "Service Employees who devote a substantial portion of their time and effort to the performance of the Services for the Aflac Group" as required under 13.4(h) and thus allowing Aflac to make offers of employment to such employees.

## EXELA'S FAILURE TO EXERCISE GOOD FAITH AND FAIR DEALING TO TRANSFER THE SERVICES

32.     Since the November Termination Notice and continuing since the instant March Termination Notice, Exela has engaged in a pattern of delaying transition of the Services.

33.     Despite its receipt of the March Termination Notice, Exela has repeatedly forestalled the implementation of crucial, yet simple, preliminary steps to transfer the Services back to Aflac.

### Exela's Failure to Issue Joint Communication to Qualified Employees

34.     Since Exela's receipt of the November Termination Notice and the March Termination Notice, Exela's representatives have stated that Exela must comply with the Worker Adjustment and Retraining Notification ("WARN") Act in order to lawfully transition the Exela employees who devote a substantial amount of their time and effort to the performance of the Services to Aflac ("Qualified Employees").

35.     The WARN Act requires employers provide written notice at least 60 calendar days in advance of a mass layoff, and Exela contends that the termination of the Agreement, transition of Services and affected jobs, qualifies as a mass layoff by Exela in this instance.

36.     Notwithstanding the November Termination Notice and the March Termination Notice, and Aflac notifying Exela of its intent to hire the Qualified Employees, Exela has not yet taken the most critical and necessary step in order to make this happen – the issuance of the WARN Act notice with a joint communication from Exela and Aflac informing the Qualified Employees of the termination of the Services by Exela and the forthcoming employment offers from Aflac.

37.     Thus, no WARN Act notice has been issued by Exela nor has the joint communication occurred, Aflac has been given no access to the Qualified Employees, and Aflac has not been given the opportunity to extend job offers to the Qualified Employees because Exela has refused to first issue the WARN Act notice and joint communication, along with Aflac, to the Qualified Employees.

*Failure to Provide Employee Roster*

38.     Section 13.4(h) of the Agreement gives Aflac the right to make offers of employment to Exela's Qualified Employees and to that end, Exela must supply Aflac at no charge with the names and resumes requested by Aflac.

39.     Since November 2020 and in the March Termination Notice, Aflac has asked for a roster of Qualified Employees, and identified March 26, 2021 as the date Aflac intended to extend offers to the Exela employees it intended to hire.

40.     However, Aflac's right to identify those employees has been frustrated and obstructed as Exela has refused to supply Aflac with the names and resumes of its Qualified Employees.

10

*Refusal to Sell and Transfer Appraised Hardware to Aflac*

41.     Pursuant to Section 13.4(b) of the Agreement, giving Aflac the right to purchase Exela's hardware used exclusively to perform the Services, Aflac and Exela agreed upon the third-party appraisal of the hardware.

42.     Exela received the final appraisal report for the hardware on March 11, 2021, and Aflac subsequently identified the hardware it desired to purchase.

43.     However, Exela has refused to effectuate the sell of that hardware to Aflac or commit to scheduling arrangements for shipping the same.

*Refusal to License Software*

44.     Pursuant to Paragraph 13.4(c) of the Agreement, Aflac and Exela agreed that Exela would license, support and maintain its commercially available software that it uses to perform the Services, to Aflac at a specific annual rate.

45.     However, despite Aflac's repeated requests, Exela has refused to provide the specific terms to the software license agreement including support and maintenance, thereby preventing the transfer of its software.

## COUNT I
### Declaratory Relief

46.     Aflac repeats and realleges Paragraphs 1- 45 of this Complaint as if fully restated herein.

47.     As stated above, under the Agreement, Exela is required to assist Aflac by providing transitioning services, as set forth in Sections 13.3-13.4.

48.     To date, despite Aflac's repeated requests, Exela has refused to perform crucial, preliminary steps to transfer the Services to Aflac, and through its delay, has breached the Agreement by failing to (a) issue a joint communication to its employees, (b) promptly supply

Aflac with a list of Qualified Employees, (c) sell and relocate the identified hardware to Aflac and (d) draft a license agreement including support and maintenance for the use of its software.

49.     Performance under a contract, to be effectual, must be substantially in compliance with the spirt and the letter of the contract and completed within a reasonable time.  O.C.G.A. § 13-4-20.

50.     Aflac seeks a declaratory judgment finding that Exela is in material breach of the Agreement.

## COUNT II
### Preliminary and Permanent Injunction

51.     Aflac repeats and realleges Paragraphs 1-45 of this Complaint as if fully restated herein.

52.     Aflac seeks entry of an injunction requiring Exela to: (a) issue the WARN Act notice and a joint communication to its Qualified Employees; (b) promptly supply Aflac with a list of Qualified Employees, along with their resumes so that Aflac may review and determine which employees it would like to extend employment offers; (c) sell and make arrangements to relocate the identified hardware to Aflac; and (d) provide a complete license agreement including support and maintenance for the use of Exela's software by Aflac.

53.     Aflac faces irreparable harm if Exela's breaches are allowed to continue. The transfer of the Services is critical to Aflac's business operations, Aflac will incur harm to its reputation and goodwill with its customers without the transfer of the Services, and Aflac faces exposure to potential liability due to Exela's failure to meet Critical Performance Indicators in its provision of the Services.

**Count III**
**Specific Performance**

54.    Aflac realleges and repleads paragraphs 1 through 45 of this Complaint as if fully restated herein.

55.    Under Subsection 14.2 of the Agreement, Aflac has the right to maintain an action for specific performance against Exela to compel compliance with the Agreement.

56.    Exela defaulted under and materially breached the Agreement.

57.    Exela failed to cure its defaults under the Agreement after receiving notice from Aflac pursuant to subsection 20.10. of the Agreement.

58.    Exela has failed and refuses to perform its transition obligations under the Agreement.

59.    The transition provisions of the Agreement at issue are definite, complete in their essential terms and capable of being enforced without adding terms.

60.    Aflac has no adequate remedy at law.

61.    The balance of equities favors an order of specific performance on Exela's contractual obligations, and no public policy will be offended by an order of specific performance.

**Count IV**
**Attorneys' Fees**

62.    Aflac realleges and repleads paragraphs 1 through 45 of this Complaint as if fully restated herein.

63.    In committing the acts described above, Exela acted in bad faith, has been stubbornly litigious and caused Aflac unnecessary trouble and expense by, inter alia, engaging in a course of gamesmanship by delaying and impairing Aflac's efforts to enforce its rights to bring the Services back in-house under the  transition provisions of the Agreement and by apparently attempting to withhold Exela's transition obligations as leverage in a drawn out negotiation to

13

extract additional monetary consideration from Aflac—in the form of current monthly fees, fees for transition services and service level support for Exela software, and impede Aflac's efforts to enforce its rights under the Agreement.

64.     Pursuant to O.C.G.A. § 13-6-11, Aflac is entitled to its attorneys' fees and expenses of litigation incurred in having been forced to bring this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following forms of relief:

a)      A judgment finding Exela has materially breached Sections 13.3 and 13.4 of the Agreement; and

b)      An order of specific performance or preliminary and permanent injunction requiring Exela to perform its termination obligations under the Agreement, including the following:

    i.    Issuing the joint communication with Aflac to Exela's Qualified Employees, informing them of the termination of the Services by Exela and the forthcoming employment offers from Aflac;

    ii.    Promptly supplying Aflac with the list of Qualified Employees, along with their resumes;

    iii.    Selling and contracting for the relocation of the hardware that Aflac has given notice that it intends to purchase; and

    iv.    Providing a complete license agreement including support and maintenance for Aflac's use of Exela's software necessary for the Services.

c)      That this Court enter judgment in favor of Aflac and against Defendants BancTec and Exela and order Defendants to pay Aflac's attorneys' fees, expenses of litigation and costs.

Respectfully submitted this 19th day of April, 2021.

                              **WARGO & FRENCH LLP**

                              */s/ Vernon M. Strickland*
                              Vernon M. Strickland
                              Georgia Bar No. 345346
                              Patrick Fitzgerald
                              Georgia Bar No. 405638
                              999 Peachtree Street, NE
                              26th Floor
                              Atlanta, Georgia 30309
                              Telephone: 404-853-1500
                              Facsimile:  404-853-153

                              *Attorneys for Plaintiff*

## **DECLARATION**

I declare under penalty of perjury that I have read the foregoing VERFIED COMPLAINT FOR INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE and that the contents stated therein are true to the best of my knowledge, information and belief.

Wassel Lewis
Vice President, Third Party Management
American Family Life Assurance Company of Columbus

4/19/2021
Date